IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA JOHNSON, | ) | CASE NO. 3:18-cv-00746 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Sandra Johnson ("Plaintiff" or "Johnson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 12.   As explained more fully below, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

Johnson protectively filed an application for DIB on March 2, 2015, alleging disability

beginning on February 7, 2012.[1]  Tr. 11, 66, 79, 172-173.  Johnson alleged disability due to

chronic back pain, myofascial pain syndrome, high blood pressure, depression, anxiety,

fibromyalgia, and nerve damage.  Tr. 66-67, 100, 208.   After initial denial by the state agency

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 4/26/2019).

(Tr. 100-108) and denial upon reconsideration (Tr. 110-116), Johnson requested a hearing (Tr. 117).

On October 20, 2016, the Administrative Law Judge ("ALJ") conducted a hearing. Tr. 31-65. The ALJ issued an unfavorable decision on March 17, 2017, (Tr. 8-30), finding that Johnson had not been under a disability within the meaning of the Social Security Act from February 7, 2012, through the date of the decision (Tr. 11, 24). Johnson requested review by the Appeals Council of the ALJ's decision. Tr. 170-171. On February 12, 2018, the Appeals Council denied Johnson's request for review, making the ALJ's March 17, 2017, decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

### A. Personal, educational, and vocational evidence

Johnson was born in 1964. Tr. 34, 172. Johnson completed four years of college in accounting. Tr. 35-36, 209. Johnson has not worked since February 7, 2012. Tr. 36, 208. Johnson's last job was at Wal-Mart as a certified optician. Tr. 36. Johnson inspected and sold glasses. Tr. 36. She worked at Wal-Mart for about 5 years. Tr. 37. She worked for a brief period at the Census Bureau going door-to-door to the homes of individuals who had not turned in their censuses. Tr. 37. Johnson also worked at Western Reserve Trading Incorporated for about a year doing accounting and bookkeeping work. Tr. 37. Prior to working at Western Reserve, Johnson worked as a substitute teacher. Tr. 37-38.

### B. Medical evidence[2]

#### 1. Treatment records

---

[2] Johnson's argument pertains to her alleged physical impairments. Thus, the medical evidence summarized herein is generally limited to treatment records and opinions relating to physical impairments.

Johnson first started having problems with her back in 2006. Tr. 480. She was able to work and function until February 12, 2012, when she stooped down to pick up a book, which made her back problems no longer tolerable. Tr. 480. Thereafter, on February 24, 2012, Johnson presented herself to the Brain Orthopedic Spine Specialists ("BOSS") with her chief complaint being back pain. Tr. 380-381. Johnson described her pain as radiating down the anterior part of her thigh on both sides but greater on the left than right. Tr. 381. Johnson reported no prior surgeries but relayed that she had epidural steroid injections and physical therapy years ago without significant relief. Tr. 381. Johnson previously had been taking Vicodin for her low back pain but, with the recent onset of increased pain, her primary care physician had switched her to Percocet. Tr. 381. Johnson felt that her legs were weak and she reported numbness/tingling in her left anterior thigh. Tr. 381. On physical examination, Johnson had normal reflexes and no sensory deficit; she had a positive straight leg raise on the left; she had some decreased strength (4/5) in her left knee; strength was otherwise normal (5/5) in Johnson's bilateral lower extremities. Tr. 381. Johnson was diagnosed with acute on chronic low back pain/leg pain and weakness in left leg. Tr. 381. An MRI of Johnson's lumbar spine was ordered. Tr. 381.

The MRI was performed on February 28, 2012. Tr. 384-385. The MRI impression as set forth in the radiological report was mild discogenic degeneration at L3-L4 and L4-L5 without visualized nerve root compression. Tr. 384-385. During a follow-up visit with Dr. Perry Argires, M.D., at BOSS, on February 28, 2012, Dr. Argires noted that the MRI showed a left-sided L3-L4 herniated disk posterolaterally and somewhat far laterally located but it was not seen or mentioned in the radiologist's report. Tr. 380. Dr. Argires' impression was left L3-L4 herniated disk. Tr. 380. He discussed surgical and non-surgical options. Tr. 380. Dr. Argires

noted that Johnson was in severe pain and she wanted to proceed with epidural steroid injections. Tr. 380.

On March 5, 2012, Johnson saw pain management doctor Dr. Trevin Thurman at BOSS and received her first epidural steroid injection. Tr. 378-379. Johnson received another epidural steroid injection on March 21, 2012. Tr. 377-378. During a follow-up visit on April 3, 2012, Johnson reported no relief from the injections. Tr. 374. On April 25, 2012, Johnson had left-sided diskectomy surgery at L4-L5.[3] Tr. 355, 367, 371, 373, 480.

At her May 8, 2012, post-op visit, Johnson was still having some pain in her lower back and in both legs at times. Tr. 371. Her pain was intermittent and better than it was pre-op. Tr. 371. Johnson relayed that the numbness in her left leg had resolved. Tr. 371. She was taking 3 Oxycodone every 4 hours and Soma three times a day. Tr. 371. A physical examination revealed normal strength and reflexes and no sensory deficit. Tr. 372. Dr. Argires advised Johnson to continue with her medication and wean as tolerated. Tr. 372. Dr. Argires advised Johnson that he would expect her to be able to decrease her Oxycodone over the next couple weeks. Tr. 372. A follow up was scheduled for three weeks. Tr. 372.

At a follow-up visit on May 25, 2012, Johnson relayed that she was still having pain – she had tightness at her incision site and pain along her lower back that radiated down into her bilateral hips. Tr. 370. She also had some numbness in her left thigh that started to come back since her surgery. Tr. 370. Soma helped relieve some of her tightness and muscle spasms. Tr. 370. Johnson's pain was worse at night. Tr. 370. Dr. Argires continued Oxycodone and Soma. Tr. 370. He prescribed a short course of steroids and started her on ibuprofen for inflammation.

---

[3] Prior to her surgery, Johnson started to have pain on her right side and relayed this information to Dr. Argires. Tr. 373.

Tr. 370.  Dr. Argires also recommended formal physical therapy to help with spasms and weakness.  Tr. 370.

Johnson started physical therapy on May 30, 2012, and continued through June 27, 2012. Tr. 361-367.  At her initial physical therapy session, Johnson relayed that her right lower extremity symptoms were worse since her surgery.  Tr. 367.  She was still having numbness/tingling in her left thigh and noted episodes of her left leg giving out.  Tr. 367.  She reported that she had felt great over the weekend on anti-inflammatory medication.  Tr. 367-368. At her June 27, 2012, physical therapy appointment, Johnson reported waking up every two hours in excruciating pain the night before.  Tr. 361.  Johnson indicated she felt like she could not be without her pain medication and did not like that at all.  Tr. 361.  Johnson felt she was getting worse.  Tr. 361.  Johnson rated her low back pain a 4 out of 10 and her right hip pain a 6 out of 10.  Tr. 361.  A decision was made to place Johnson's physical therapy on "hold" because of her complaints of right hip pain.  Tr. 361.  The therapist planned to await further instructions from Johnson's doctor.  Tr. 361.

Johnson saw Dr. Argires on July 6, 2012.  Tr. 360.  Dr. Argires noted Johnson's complaints of right-sided pain and noted that she had a positive Faber sign by examination.  Tr. 360.  Dr. Argires referred Johnson for a right intra-articular injection of her hip to assess whether the pain was coming from her hip or back and he ordered a lumbar spine MRI.  Tr. 360.  Johnson proceeded with the intra-articular injection and MRI.  Tr. 357.  She saw Dr. Argires for follow up on July 31, 2012.  Tr. 357.  Dr. Argires examination revealed intense pain over Johnson's sacroiliac joint region.  Tr. 357.  Dr. Argires noted that the post-surgical MRI that he ordered showed no evidence of neural compression at any level.  Tr. 357.  Dr. Argires indicated that he did not think that Johnson's pain was coming from her hip because she obtained no relief from

the intra-articular injection. Tr. 357. He recommended that Johnson proceed with a sacroiliac joint injection and, if Johnson had a positive response, she should then proceed with ablation. Tr. 357. If those measures did not work, Dr. Argires recommended that Johnson should then proceed with an evaluation for a neurostimulator trial. Tr. 357-358.

On August 9, 2012, Johnson saw Dr. Thurman for follow up. Tr. 355. Dr. Thurman noted that Johnson had significant improvement of her left-sided symptoms following her diskectomy but she was having chronic pain in her right buttock, extending laterally along the right hip and rarely below the right knee. Tr. 355. On examination, Dr. Thurman observed that Johnson was intact neurologically in her bilateral lower extremities. Tr. 355. Dr. Thurman's musculoskeletal examination revealed moderate tenderness of the right sacroiliac and a significantly positive right Patrick's test. Tr. 355. Dr. Thurman's impression was right sacroiliac joint pain, right mechanical sacroiliac joint dysfunction with rotation of the right innominate, and left lumbar laminectomy syndrome. Tr. 355. Dr. Thurman recommended a right sacroiliac joint injection to be followed by physical therapy that would specifically include manipulation of the right sacroiliac joint. Tr. 355. If those measures did not work, Dr. Thurman indicated that the next step would be right sacroiliac joint ablation. Tr. 355.

Dr. Thurman administered the right sacroiliac joint injection on August 20, 2012. Tr. 354. Thereafter, Johnson attended physical therapy from August 27, 2012, until September 11, 2012. Tr. 347-351. During a follow-up visit with Dr. Thurman on September 12, 2012, Johnson reported that physical therapy helped with some of the symptoms in her buttock but it did not improve her leg pain. Tr. 347. Johnson indicated that the pain she was feeling on her right side was similar to the pain she had on her left side prior to her surgery but not completely the same. Tr. 347. Johnson's buttock and leg pain were brought on by similar activities. Tr. 347. Dr.

Thurman thought that Johnson might have two overlapping pain generators and recommended an epidural steroid injection for diagnostic and therapeutic purposes at the right L4-L5 and right S1 transforaminal.  Tr. 347.  On September 26, 2012, Dr. Thurman administered the right L4-L5 and right S1 transforaminal epidural steroid injections.  Tr. 345.

Johnson saw Dr. Thurman for follow up on October 25, 2012.  Tr. 343.  Johnson reported 50% relief of her leg pain for 2 weeks and then her symptoms returned.  Tr. 343.  The injections did not change any of the pain in Johnson's buttock. Tr. 343.  Johnson had good but brief relief from the sacroiliac joint injection.  Tr. 343.  Johnson did not feel that physical therapy helped improve her symptoms.  Tr. 343.  Physical examination showed 5/5 strength in the left lower extremity and some decreased strength in the right lower extremity with some mild, diffuse giveaway weakness.  Tr. 343.  Dr. Thurman's impression was chronic right lumbar radiculopathy with a question of overlapping sacroiliac joint pain versus overlying radicular pain.  Tr. 343.  Dr. Thurman offered recommendations for further treatment of Johnson's lumbar radicular pain, including a spinal cord stimulator trial.  Tr. 343.  Dr. Thurman also offered recommendations for Johnson's right buttock pain but noted that Johnson's insurance company had not paid for her sacroiliac joint injection and they might not approve other treatment for her sacroiliac joint.  Tr. 343.

On November 9, 2012, Johnson agreed to proceed with the spinal cord stimulator trial for treatment of the radicular lumbar pain.  Tr. 341.  No further treatment was recommended for the sacroiliac joint paint because Johnson's insurance company was not willing to cover the costs. Tr. 341.

On December 21, 2012, Johnson proceeded with the spinal cord stimulator trial.  Tr. 337-338.  On December 24, 2012, the spinal cord stimulator trial leads were removed.  Tr. 337.

Johnson was pleased with the results, reporting 95% relief of her leg pain and 60% relief of her low back and buttock pain and was interested in a permanent spinal cord stimulator. Tr. 337. The spinal cord stimulator was permanently implanted on February 7, 2013. Tr. 330-333. During an April 2, 2013, follow-up visit, Johnson reported severe right leg and buttock pain. Tr. 321. She had started on a steroid but it was not helping control her pain. Tr. 322. On examination, Johnson's sensory and motor functions were intact in the lower extremities bilaterally and equal; Johnson's strength was 5/5 in her lower extremities bilaterally and equal; and straight leg raise was positive on the right. Tr. 322-323. Jared L. Thatcher, PA-C, on consultation with Dr. Argires, recommended a spinal cord stimulator adjustment; physical therapy; and a referral to Dr. Cohen for pain management. Tr. 323.

Upon Dr. Argires' referral, Johnson saw Dr. Randy Cohen, D.O., for a pain management consultation. Tr. 480-481. Johnson reported that her pain level was a 5 out of 10 on average with the range being between a 3 and 9 out of 10. Tr. 480. Johnson described her pain as shooting, exhausting, pressure, sharp, radiating, constant, unbearable, aching, stabbing and miserable. Tr. 480. Her pain was worse with walking, lifting, standing, bending and sitting. Tr. 480. Pain relieving factors were heat and lying down. Tr. 480. On examination, Dr. Cohen observed that Johnson was in acute distress and could not maintain a static position – she had to alternate between sitting, standing and walking rather than standing in one place. Tr. 481. Johnson's gait was normal; her right quadratus lumborum was very, very tight and tender to palpation with pain radiating into her hip and down her leg; she had trigger points randomly located throughout the lumbar and thoracic paraspinal muscles, right shoulder and upper trapezius muscles; her neurological exam showed no focal motor or sensory deficits; her reflexes were intact; and straight leg raise was negative. Tr. 481. Dr. Cohen's impressions were chronic

low back pain, s/p laminectomy L3-4 with facetectomy and discectomy; myofascial pain low back; depression; and sleep disturbance.  Tr. 481.  Dr. Cohen made some modifications to Johnson's medication, including switching her to more long-acting pain medications rather than short-acting.  Tr. 481.  He recommended that Johnson continue with physical therapy.  Tr. 481.  Johnson saw Dr. Cohen again in May and June 2013.  Tr. 482-484.  Johnson reported doing better overall (Tr. 482) and that physical therapy was helping a lot (Tr. 484).  During her June 19, 2013, visit with Dr. Cohen it was noted that Johnson was planning on moving to Ohio in July so Johnson would need to find a new pain management doctor.  Tr. 484.  Based on a referral from Dr. Cohen, Johnson attended physical therapy from May 2013 through July 2013.  Tr. 278-318, 398-451.

On July 2, 2013, Johnson saw Paul G. Avadanian, D.O., regarding right shoulder pain.  Tr. 491.  Johnson indicated that she was also getting weak and was unable to hold things.  Tr. 491.  Johnson was dropping things and it had been getting worse over the prior few weeks.  Tr. 491.  Dr. Avadanian administered a trigger point injection in Johnson's right trapezius.  Tr. 491.  Johnson tolerated it well and reported immediate relief.  Tr. 491.

After moving to Ohio, Johnson saw Dr. Eric G. Prack, M.D., on August 6, 2013, to establish as a new patient.  Tr. 926-929.  Dr. Prack assessed hypertension, benign; tobacco user; and myofascial pain syndrome.  Tr. 927-928.  Dr. Prack referred Johnson for pain management for her myofascial pain syndrome.  Tr. 928, 929.

Per Dr. Prack's referral, Johnson met with Dr. Zachary Zumbar, M.D., for pain management.  Tr. 765-768.  Johnson rated her bilateral mid to low back pain a 5 out of 10 and described her pain as sharp, stabbing, shooting and aching.  Tr. 765.  She indicated that the spinal cord stimulator was mildly helpful.  Tr. 765.  She was taking a number of different medications,

which she indicated were helpful but she still had a significant amount of pain. Tr. 766. Johnson felt physical therapy had been helpful in the past and she was interested in continuing with it. Tr. 766. On examination, Dr. Zumbar observed bilateral myofascial tenderness in both the thoracic and lumbar areas; her strength was 5/5 throughout; her muscle tone was normal; straight leg raise was negative bilaterally; reflexes were normal and symmetric; and sensation was intact throughout, with the exception of mildly diminished sensation to light touch over the anterior lateral left thigh. Tr. 766-767. Dr. Zumbar felt that Johnson's initial signs and symptoms were consistent with lumbar neuritis from a herniated lumbar disc but her issues were now more consistent with myofascial pain syndrome. Tr. 767. Dr. Zumbar explained to Johnson that she was on high doses of narcotics and he did not feel it was a good idea to treat myofascial pain in that manner. Tr. 767. He recommended weaning her down to more reasonable doses of narcotic medication and he hoped to get her entirely off of narcotics. Tr. 767. Dr. Zumbar recommended physical therapy and he discussed with Johnson the possibility of the Chronic Pain Rehabilitation Program at the Cleveland Clinic. Tr. 767. From August 2013 through October 2013, Johnson attended physical therapy upon referral from Pamela Snyder CNP/Dr. Zumbar. Tr. 817-831.

Johnson saw Dr. Zumbar for a follow-up visit on October 4, 2013. Tr. 773-775. Johnson relayed that physical therapy was helping. Tr. 773. She had met with Dr. Malecki for a consultation at the Chronic Pain Rehabilitation Program at the Cleveland Clinic. Tr. 773. Dr. Malecki thought Johnson was a good candidate for the program and Johnson was hopeful she could start at the end of the month. Tr. 773. Dr. Zumbar made some adjustments to Johnson's medications and planned to see her for follow up. Tr. 774-775.

From October 29, 2013, through November 23, 2013, Johnson participated in the Cleveland Clinic Chronic Pain Rehabilitation Program. Tr. 499-578, 604-704. During the

program, Johnson demonstrated improvement. Tr. 500, 502. For example, Johnson could lift 8 pounds from floor to waist initially and at discharge she was able to lift 18 pounds. Tr. 500. Initially, Johnson could carry 8 pounds for 20 feet and at discharge she could carry 20 pounds in that distance. Tr. 500. Johnson's gait was initially described as decreased pelvic stability and decreased cadence while at discharge her gait was within normal limits. Tr. 502. Initially, Johnson could climb 30 steps in one minute and at discharge she could climb 65 steps in one minute. Tr. 502. Initially, Johnson could walk .19 miles in 6 minutes and at discharge she could walk .28 miles in that time. Tr. 502. Johnson's reaching ability was 13 inches initially and at discharge it was 18 inches. Tr. 502. When she was discharged from the program, Johnson's diagnoses were spondylosis with s/p L3-4 discectomy and DCS placement; spinal arthropathy and paraspinal myofascial pain and radiculopathy; chronic pain with physical and psychosocial dysfunctions; possible opiate induced hyperalgesia; opioid addiction and nicotine dependence; alcohol dependence in sustained remission; and compulsive gambling in remission. Tr. 602. Following discharge from the program, on December 6, 2013, Johnson attended an Aftercare treatment session. Tr. 602-604.

On April 28, 2014, Johnson saw Dr. Vicki J. Brown, M.D., at her primary care physician's office for follow up after a hospital visit for chest pain. Tr. 874-877. Johnson complained of fatigue and low stamina. Tr. 874. Johnson indicated she had progressed from chronic dependence on narcotics for her pain – Johnson was not sure she could work a routine job and noted she was thinking about applying for disability. Tr. 874. On examination, Dr. Brown noted that Johnson changed from seated to standing. Tr. 875. Otherwise, examination findings were unremarkable. Tr. 875. Dr. Brown assessed hypertension, benign, and chest pain and provided recommendations for treatment of both conditions. Tr. 876.

Johnson saw Dr. Brown the following month on May 30, 2014, for a blood pressure check. Tr. 870-873. During the visit, Johnson complained of increased back and leg pain that was worse if she was less active but activity also caused pain as well. Tr. 870. Johnson wanted some changes to her medications. Tr. 870. She did not have access to perform water exercises. Tr. 870. Her sleep was fair on Trazadone and Zanaflex. Tr. 870. During the examination, Johnson was seated but Dr. Brown observed frequent movements and that Johnson rubbed her legs. Tr. 871. Dr. Brown assessed hypertension, unchanged, and myofascial pain syndrome. Tr. 872. Dr. Brown made medication changes – she stopped Johnson's Tramadol, continued her muscle relaxant and restarted her on Gabapentin. Tr. 872.

During a November 26, 2014, visit with Dr. Brown, Johnson complained of a lot of problems with her back and she was not sleeping well even with the muscle relaxant and Trazadone. Tr. 862. Johnson stopped taking Gabapentin because of the side effects. Tr. 862. She was using the Tramadol sparingly during the day because she could not sleep with it. Tr. 862. Johnson wanted to avoid narcotics because of her history of dependence. Tr. 862. She still had the spinal cord stimulator implanted and was performing exercises as recommended by physical therapy. Tr. 862. On examination, Dr. Brown observed that Johnson was standing and shifting her weight and she had "decreased lumbar lordosis, firm spasm palpated bilateral lumbar paraspinal muscles." Tr. 863. Dr. Brown assessed back pain, lumbar, with radiculopathy and myofascial pain syndrome. Tr. 864. For Johnson's back pain, Dr. Brown recommended a pain management consultation for injections. Tr. 864. For Johnson's myofascial pain, Dr. Brown increased Johnson's Trazadone at bedtime. Tr. 864.

Johnson sought emergency room treatment on January 10, 2015, for left flank pain. Tr. 705-707. She was diagnosed with acute pyelonephritis and prescribed an antibiotic. Tr. 706.

Johnson followed up with Dr. Brown on January 15, 2015.  Tr. 712-715.  Johnson was

continuing to have left flank pain.  Tr. 712.  Dr. Brown noted that a CT scan showed a kidney

stone in the left kidney and she referred Johnson to a urologist.  Tr. 712, 715.  Johnson saw

urologist Dr. Donald L. Smith, M.D., that same day.  Tr. 717-720.  Dr. Smith noted that the CT

scan showed a 7 mm kidney stone in the left kidney but there was no obstruction seen on the CT

scan.  Tr. 719.  Dr. Smith felt that Johnson's pain appeared to be out of proportion to the

radiology findings.  Tr. 719.  However, he recommended ESWL[4] of the renal calculus.  Tr. 719.

Johnson saw Dr. Brown again on January 19, 2015, for follow up regarding her left flank

pain.  Tr. 722-725.  Dr. Brown noted that Dr. Smith felt that the kidney stone was non-

obstructing and was not the cause of Johnson's pain.  Tr. 722.  Johnson's left-mid-abdominal

pain was worse with standing and walking, sitting, and while using the restroom.  Tr. 722.

Johnson's pain was relieved by lying down with a pillow supporting her upper abdomen.  Tr.

722.  Dr. Brown recommended a referral back to pain management as soon as possible.  Tr. 725.

Dr. Brown also ordered an x-ray of the thoracic and lumbar spine.  Tr. 725.  The x-ray, taken on

January 19, 2015, showed disc degeneration and spondylosis throughout the thoracic spine,

upper and mid lumbar levels; no acute thoracic or lumbar spine fracture; and the neurostimulator

overlaid the lower thoracic region from lower T7 through T9 levels.  Tr. 721.

Upon Dr. Brown's referral, Johnson attended physical therapy on January 27, 2015,

through April 16, 2015, for her back pain.  Tr. 727-728, 748-817.

Per Dr. Brown's referral, Johnson saw Dr. Zumbar again on January 29, 2015.  Tr. 729-

731.  Dr. Zumbar commented that he last saw Johnson in October 2013 and, at that time,

---

[4] ESWL likely stands for Extracorporeal Shock Wave Lithotripsy.  *See*
https://www.kidney.org/atoz/content/kidneystones_shockwave (last visited 4/26/2019).

Johnson had proceeded with the Chronic Pain Rehabilitation Program and did fantastic, noting that she had weaned off all narcotics and her functional status was mostly restored. Tr. 729. Johnson continued to have some baseline lower back pain with radiation to the legs but it was much improved as compared to when she first saw Dr. Zumbar. Tr. 729. Johnson relayed that she had continued to do well until she had a rather sudden onset of left-sided midback pain that radiated around the flank and into the ribs and abdomen on the left side. Tr. 729. Prior to the flank pain Johnson had been using her stimulator which helped but, since the flank pain started, she found that using the stimulator aggravated the pain so she had turned it off for the past few weeks. Tr. 729. Dr. Zumbar felt that Johnson's signs and symptoms were consistent with thoracic neuritis secondary to spondylosis and degenerative disc disease. Tr. 730. Dr. Zumbar added a medication to Johnson's then current medications to help with the neuropathic component of her pain and ordered additional imaging. Tr. 730.

On February 6, 2015, a CT scan of Johnson's thoracic spine, and x-ray of the lumbosacral spine, and an x-ray of the thoracic spine were taken. Tr. 734-736, 737-738, 739-740. The CT scan showed mild multilevel anterior endplate spurring of the mid-lower thoracic spine; minimal disc space narrowing in the upper lumbar spine; and no acute fracture or subluxation of the thoracolumbar spine. Tr. 734. The x-ray of Johnson's lumbosacral spine showed mild multilevel degenerative change of the lumbar spine; no fracture or subluxation; and probable small left renal calculus. Tr. 737. The x-ray of Johnson's thoracic spine showed mild multilevel disc space narrowing and endplate spurring of the mid-lower thoracic spine and no fracture or subluxation. Tr. 739.

Johnson saw Dr. Zumbar for follow up on February 12, 2015. Tr. 741-742. Johnson reported that her symptoms were mildly improved. Tr. 741. She was attending physical therapy

and felt that it helped. Tr. 741. Johnson had been prescribed a narcotic and was using it as little as possible because she was concerned about taking narcotics again. Tr. 741. On examination, Dr. Zumbar observed left-sided thoracic paraspinal tenderness and tenderness over the lateral left ribs. Tr. 741-742. Dr. Zumbar felt that Johnson's signs and symptoms were consistent with intercostal neuritis. Tr. 742. Dr. Zumbar was encouraged that Johnson had shown some improvement since the last visit. Tr. 742. He recommended that Johnson continue with physical therapy and continue with her medications, including Norco for breakthrough pain. Tr. 742. Johnson did not want a refill of her Norco. Tr. 742. Dr. Zumbar prescribed a Medrol Doespak to see if it helped with her symptoms and indicated that if it did not they would proceed with left-sided intercostal nerve injections. Tr. 742. Johnson received an intercostal block on February 27, 2015, and reported about 20% pain relief. Tr. 743. Johnson continued to treat with Dr. Zumbar through May 2015 and received additional intercostal blocks as well as a caudal epidural steroid injection for her back and leg pain. Tr. 743-745, 746-747, 749-750, 785-786, 790, 932-933, 937. During a May 20, 2015, visit, Dr. Zumbar indicated that he felt that Johnson's rib pain was consistent with intercostal neuritis and her low back pain was consistent with lumbar neuritis and post laminectomy syndrome. Tr. 750. Dr. Zumbar also felt that there was a possibility that Johnson might have significant cervical stenosis that was causing her symptoms. Tr. 750. Dr. Zumbar made a small adjustment to Johnson's medication regimen. Tr. 750. He noted that they were going to have Johnson's stimulator reprogrammed to see if it could do a better job controlling her right leg pain and possibly some of her rib pain. Tr. 750. Dr. Zumbar also wanted to obtain a CT scan of Johnson's cervical spine to see if there was a cervical disc causing her symptoms. Tr. 750.

Johnson saw Dr. Brown on July 7, 2015.  Tr. 956-960.  Johnson complained of ongoing back pain and left-side thoracic pain with radiculopathy at both areas.  Tr. 956.  Johnson relayed that she was applying for disability, noting that she did not want to but felt she was unable to function in a work environment and was also limited at home.  Tr. 956.  She had received injections and ongoing pain management but she wanted to a have a solution.  Tr. 956.  She had been dropping things lately so Dr. Zumbar had ordered a CT scan of her neck.  Tr. 956.  Johnson had noticed some orthostatic symptoms during the prior week and her blood pressure had been lower than usual.  Tr. 956.  On physical examination, Dr. Brown noted that Johnson changed positions frequently and appeared to be uncomfortable.  Tr. 958.  Also, Dr. Brown observed that Johnson was tearful, depressed, had low motivation and was frustrated.  Tr. 958.  Dr. Brown's assessment was back pain, lumbar, with radiculopathy and depression.  Tr. 958.  With respect to her back pain, Dr. Brown noted that Johnson was following with pain management and she agreed with Johnson's plan to limit narcotics.  Tr. 958.

On July 29, 2015, Dr. Zumbar administered an intercostal nerve block.  Tr. 762.  Johnson saw Dr. Zumbar for follow up on August 26, 2015.  Tr. 1167-1168.  During that visit, Johnson reported greater than 50% relief from the recent injection that lasted about three weeks.  Tr. 1167.  Johnson noted that her generator battery was not charging so she had been unable to use her stimulator.  Tr. 1167.  Thus, her leg pain had been somewhat worse but no where near as bothersome as her rib pain.  Tr. 1167.  Johnson was continuing to use Zonegran and Zanaflex and she felt those medications were helpful.  Tr. 1167.  She was using Norco as little as possible but was averaging about two tablets per day.  Tr. 1167.  On physical examination, Dr. Zumbar observed left-sided thoracic and right-sided lumbar paraspinal tenderness; Johnson's strength was 5/5 throughout and her muscle tone was normal.  Tr. 1168.  Johnson's sensation was intact

except she exhibited diminished sensation to light touch over the lateral left thigh. Tr. 1168. Her reflexes were normal and symmetric. Tr. 1168. Dr. Zumbar felt that Johnson's signs and symptoms were consistent with intercostal neuritis and possibly the result of mechanical irritation from her stimulator lead. Tr. 1168. Dr. Zumbar recommended that Johnson continue with her current medications and he referred her to Dr. Moore for his opinion about removing her stimulator. Tr. 1168.

Per Dr. Zumbar's referral, on September 4, 2015, Johnson saw Dr. Don K. Moore, M.D., with the Cleveland Clinic for a consultation regarding her rib pain. Tr. 1072-1082. Johnson questioned whether the stimulator was aggravating her rib pain. Tr. 1072. Also, Johnson relayed that she had recently been dropping things with her left hand. Tr. 1072. Johnson denied upper shoulder weakness but did have left-handed numbness. Tr. 1072. Dr. Moore recommended that Johnson follow up with Dr. Zumbar to see about having the spinal cord stimulator evaluated to determine whether the spinal cord stimulator paddle was not working properly, noting that the lead might be broken. Tr. 1076. Alternatively, Dr. Moore recommended that Johnson follow up with Dr. Brendan Bauer to see if she was experiencing some sort of variant of intercostal neuritis that could be viral induced or idiopathic. Tr. 1076.

On October 30, 2015, per Dr. Moore's referral, Johnson saw Dr. Jacqueline M. Graziani of Advanced Neurologic Associates, Inc. regarding her left-side intercostal pain.[5] Tr. 1062-1067. Johnson relayed that she had been having back pain since the beginning of January. Tr. 1062. Johnson indicated that she could not use her neuro stimulator because it exacerbated her intercostal pain. Tr. 1062. Johnson stated that there were times when her pain was so bad that

_____

[5] As noted above, Dr. Moore recommended that Johnson see Dr. Bauer. Tr. 1076. It is not clear whether Dr. Graziani was seen instead of Dr. Bauer.

she could not move. Tr. 1062. Intercostal injections had provided pain relief for only about a week. Tr. 1062. Johnson relayed that she had severe numbness and tingling in her left upper thigh and some in her right leg but not as bad. Tr. 1062. Dr. Graziani diagnosed intercostal neuralgia, thoracic back pain, and pain. Tr. 1065. Dr. Graziani indicated that Johnson's intercostal pain could be due to the stimulator she had implanted in 2013 but Dr. Graziani noted that further work up was needed and she was not certain how much more she could do for Johnson. Tr. 1065. Dr. Graziani thought that Johnson might need her stimulator removed. Tr. 1065, 1066. Dr. Graziani ordered a CT scan of the thoracic spine to look for any fluid collection and she added Lyrica to Johnson's medications for neuropathic pain. Tr. 1065, 1066.

Johnson saw Dr. Zumbar on November 11, 2015, for follow up regarding her left rib pain. Tr. 1172-1173. Johnson relayed that her symptoms had been persistent. Tr. 1172. Johnson had not started on Lyrica as recommended by the neurologist due to the cost. Tr. 1172. Dr. Zumbar tried to have Johnson's stimulator reprogrammed but they were unable to do so because the battery had gone dormant. Tr. 1172. Johnson was advised to work on "waking it back up" and to call Dr. Zumbar's office once the stimulator was started up again. Tr. 1172. Dr. Zumbar provided Johnson with a prescription for Zofran because she indicated that when the pain was really bad she had some nausea. Tr. 1173. He also provided her a prescription for Tramadol that he said she could use in place of Norco. Tr. 1173.

Johnson saw Dr. Zumbar again on February 4, 2016. Tr. 1174-1175. Johnson had recharged her stimulator and they tried to reprogram it twice but their attempts were unsuccessful. Tr. 1174. Johnson was still using Zonegran, Tizanidine, Norco and Tramadol and reported that they were helpful to an extent. Tr. 1174. On physical examination, Dr. Zumbar observed left-sided thoracic paraspinal tenderness that wrapped into Johnson's left ribs. Tr.

1175.  Johnson's strength was 5/5 throughout and her reflexes were normal and symmetric.  Tr. 1175.  Dr. Zumbar recommended that Johnson continue on her current medications because they were providing her enough pain relief to remain functional and he planned to refer her to a neurosurgeon for removal of the stimulator.  Tr. 1175.

On March 2, 2016, Johnson saw neurologist Dr. Andre G. Machado, M.D., at the Cleveland Clinic for an evaluation of her chronic pain and spinal cord stimulator.  Tr. 1095-1100, 1250.  On physical examination, Dr. Machado observed 4/5 muscle strength in the upper and lower extremities; normal muscle tone without evidence of atrophy; steady gait; negative Romberg test; decreased sensation to pinprick in the lower extremities bilaterally; and her deep tendon reflexes were +2/4 throughout.  Tr. 1098.  Dr. Machado recommended that Johnson have a thoracic CT myelogram to rule out spinal pathology.  Tr. 1098.

The CT myelogram was performed on March 16, 2016.  Tr. 1247-1249.  Johnson saw Dr. Brown on April 7, 2016, for a check-up.  Tr. 1223-1228.  Dr. Brown noted that the CT myelogram had revealed extensive scar tissue and Johnson was going to have the stimulator removed.  Tr. 1223.  Once the stimulator was removed, Johnson would be able to have an MRI. Tr. 1223.  Johnson saw Dr. Machado on April 20, 2016.  Tr. 1110-1113.  Johnson was not interested in trying further attempts to reprogram her stimulator.  Tr. 1110.  She preferred to proceed with removal of the stimulator.  Tr. 1110.  A few days later, on April 25, 2016, Dr. Machado performed surgery to remove the spinal cord stimulator.  Tr. 1139-1141.  When Johnson returned for a surgical follow-up appointment with John G. Ozinga, PA-C, on May 5, 2016, Johnson reported that she continued to have left flank pain.  Tr. 1124.  Mr. Ozinga recommended that thoracic and lumbar MRIs be taken and refilled Johnson's Norco.  Tr. 1124.

She was taking 2 Norco every 6 hours and was trying to reduce it but her pain continued to be severe. Tr. 1124.

Johnson saw Dr. Zumbar on May 19, 2016. Tr. 1178-1179. During that visit, Johnson relayed that her left-sided rib pain was better since removal of the stimulator and was not radiating all the way around to her stomach. Tr. 1178. She was still having some pain in the lateral aspect of her flank and she had some mid-back pain over the surgical site, which she thought was improving. Tr. 1178. The pain in Johnson's lower back and legs remained persistent. Tr. 1178. Dr. Zumbar felt that Johnson's symptoms were consistent with thoracic radiculopathy. Tr. 1179.

The thoracic and lumbar spine MRIs were performed on June 17, 2016. Tr. 1128-1132. The MRIs showed interval postoperative changes at T10-11 notable for moderate bilateral foraminal encroachment with no intrinsic cord abnormality; left foraminal disc protrusion at L2-3 with less apparent effect on the existing L2 nerve root; and interval postoperative change at L3-4 – mild lower lumber degenerative changes without significant canal or foraminal encroachment. Tr. 1128, 1130. The same day, Johnson saw Mr. Ozinga for a surgical follow-up appointment. Tr. 1133. Johnson was down to taking 1-2 tablets per day. Tr. 1133. She explained that her left flank pain had continued but it did not wrap all the way around. Tr. 1133. Johnson relayed that she also had occasional right flank pain. Tr. 1133. Mr. Ozinga noted that Johnson's imaging would be reviewed with Dr. Machado. Tr. 1133.

Johnson saw Dr. Brown on July 7, 2016, for a follow-up regarding her left flank pain. Tr. 1204-1208. Johnson remained in pain and was continuing to take some level of narcotics.[6] Tr. 1204.

---

[6] Johnson also reported some abdominal pain that varied in intensity. Tr. 1204, 1205. Dr. Brown noted that Johnson's abdominal pain might be diverticulitis and recommended further evaluation. Tr. 1206. Further testing

Upon Mr. Ozinga's referral, Johnson saw spine surgeon Dr. John B. Butler, M.D., on July 27, 2016. Tr. 1157-1166. Dr. Butler noted he reviewed the recent imaging, noting that it showed some foraminal encroachment at T10-11 which he felt could correlate with her intercostal pain. Tr. 1161. Dr. Butler also noted that, after reviewing the lumbar MRI, which showed some mild diffuse degenerative changes and was mild for lateral recess narrowing, he did not have a good explanation for Johnson's lower extremity symptoms. Tr. 1161. Dr. Butler's impression was postlaminectomy syndrome, lumbar region and lumbosacral radiculitis. Tr. 1160. He ordered an EMG nerve conduction study of both lower extremities and ordered a T10-11 left-sided nerve root block. Tr. 1161.

Johnson saw Dr. Zumbar on July 28, 2016. Tr. 1181-1182. Dr. Zumbar felt that Johnson's signs and symptoms were consistent with thoracic disc disorder with radiculopathy. Tr. 1182.

Johnson saw Dr. Brown on August 5, 2016, for completion of functional capacity forms. Tr. 1197-1200. Johnson relayed that she was seeking disability with the assistance of an attorney and she was requesting that Dr. Brown complete forms regarding her mental and physical capacities. Tr. 1197. On physical examination, Dr. Brown observed that Johnson was changing positions from sitting to standing every 10 minutes. Tr. 1198. While Johnson was seated, her legs were shaking, tapping. Tr. 1198. Dr. Brown noted that the requested forms were completed. Tr. 1199.

Dr. Zumbar proceed with administering a left T10-11 transforaminal epidural steroid injection on August 17, 2016. Tr. 1183. Johnson saw Dr. Zumbar for follow up on September 8, 2016. Tr. 1229-1230. During that visit, Johnson relayed that her recent injection provided her

---

relative to her complaints of abdominal pain showed normal esophagus, a moderate sized hiatal hernia, mild antral erosions, and duodenal bulb erosions and pinpointed ulcers. Tr. 1186-1189, 1190-1191.

about 80% relief with respect to her rib pain. Tr. 1229. Johnson was scheduled to see Dr. Butler to discuss surgical options. Tr. 1229. She described her rib pain as markedly improved but she was still having problems with her lower back and leg since her stimulator was removed. Tr. 1229. Johnson had to stop taking Mobic because an EGD study showed some ulcers. Tr. 1229. Because she was not taking Mobic, Johnson had increased her use of Norco. Tr. 1229. She was also taking Zanaflex and Zonegran along with the Norco. Tr. 1229. Her medications remained helpful and she denied side effects from them. Tr. 1229. Dr. Zumbar continued Johnson on her current medications and noted he would see Johnson for follow up in 6-8 weeks. Tr. 1230.

On October 19, 2016, Johnson saw Dr. Butler for follow up regarding her lower extremity and flank pain. Tr. 1266-1274. Dr. Butler noted that Johnson had an EMG and underwent a nerve block at T10-11 with good relief for 3-4 weeks. Tr. 1266. Dr. Butler's physical examination findings were unremarkable. Tr. 1267. Dr. Butler indicated that the EMG was negative for lumbosacral motor radiculopathy or large fiber sensorimotor polyneuropathy. Tr. 1267. His impression was chronic left-sided thoracic back pain and low back pain with sciatica, sciatica laterality unspecified, unspecified back pain laterality, and unspecified chronicity. Tr. 1268. In light of the relief Johnson received from the T10-11 nerve root injection, Dr. Butler recommended a second injection. Tr. 1268. He did not feel that Johnson was a surgical candidate at that time. Tr. 1268.

**2.      Opinion evidence**

*Treating source*

Treating physician Dr. Brown completed two assessments of Johnson's physical capacity.[7]  Tr. 941-942, 1142-1143.

The first assessment was completed on July 7, 2015.  Tr. 941-942.  In that assessment, Dr. Brown opined that Johnson was limited as follows: she could lift/carry 10 pounds occasionally and 5 pounds frequently; she could stand/walk for a total of 2 hours and stand/walk for 15 minutes without interruption; she could sit for a total of 2 hours and sit for 15 minutes without interruption; she could rarely climb, balance, stoop, crouch, kneel or crawl; she could occasionally reach, push/pull, and perform gross manipulation; she could frequently perform fine manipulation; she would need to avoid moving machinery; and she would need to be able to alternate positions between sitting, standing and walking at will.  Tr. 941-942.  Dr. Brown opined that Johnson's pain was severe and would interfere with concentration, take her off-task, and cause absenteeism.  Tr. 942.  Dr. Brown opined that Johnson would not need to elevate her legs at will.  Tr. 942.  Dr. Brown opined that Johnson would require additional unscheduled rest periods beyond the normal 1/2 lunch and two 15-minute breaks.  Tr. 942.  Dr. Brown did not specify the total amount of additional rest time that Johnson would require on an average day. Tr. 942.  While space was provided for Dr. Brown to state the medical findings that supported her assessment, Dr. Brown did not include that information.  Tr. 941-942.

---

[7] Dr. Brown also provided assessments of Johnson's mental capacity.  Tr. 939-940, Tr. 1144-1145.  Johnson's challenge on this appeal pertains to the ALJ's evaluation of Johnson's physical impairments.  Thus, the mental capacity assessments are not detailed herein.

The second physical capacity assessment was completed on August 5, 2016. Tr. 1142-1143. Dr. Brown's opinions were similar except she opined that Johnson would be limited to frequent rather than occasional gross manipulation; she would need to avoid heights and temperature extremes; and she would need to elevate her legs at will to 90 degrees. Tr. 1143. Dr. Brown also indicated that a cane had been prescribed and specified that the total amount of additional rest time that Johnson would require on an average day was 6 hours. Tr. 1143. Unlike the first assessment, when asked to provide the medical findings that supported her assessment, Dr. Brown noted chronic pain, medications, anxiety and depression. Tr. 1142-1143.

*State agency reviewers*

On May 19, 2015, state agency reviewing physician Dr. Stephen Sutherland, M.D., completed a physical RFC assessment. Tr. 75-77. Dr. Sutherland opined that exertionally Johnson could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; push/pull unlimitedly, other than as shown for lift/carry. Tr. 75. Dr. Sutherland explained that the stated exertional limitations were due to Johnson's history of back pain. Tr. 75. Dr. Sutherland opined that Johnson would have the following postural limitations: never climbing ladders/ropes/scaffolds and frequent climbing ramps/stairs, stooping, kneeling, crouching, and crawling. Tr. 75-76. In explaining the stated postural limitations, Dr. Sutherland referenced February 6, 2015, thoracic and lumbar spine imagining that showed mild multilevel anterior endplate spurring of the mid-lower thoracic spine; minimal anterior endplate spurring of L1-L2; minimal disc space narrowing from L1-L2 through L3-L4; no appreciable disc extrusion or focal central canal narrowing. Tr. 76. Dr. Sutherland opined that Johnson would have to avoid concentrated exposure to vibration and concentrated exposure to hazards (machinery, heights,

etc.).  Tr. 76.  Dr. Sutherland explained that the environmental limitations were due to exacerbation of pain.  Tr. 76.  Dr. Sutherland further explained that the RFC limitations were based on medical records reflecting left-sided thoracic pain, low back pain and mid-back/left-rib pain.  Tr. 76.

Upon reconsideration, on August 24, 2015, state agency reviewing physician Dr. Michael Delphia, M.D., completed a physical RFC assessment, affirming Dr. Sutherland's earlier limitations.  Tr. 88-90.

**C.     Hearing testimony[8]**

**1.      Plaintiff's testimony**

Johnson testified and was represented at the hearing.  Tr.  34-58.

When asked what prevented her from working, Johnson explained that she has a hard time remembering things and concentrating.  Tr. 38.  Johnson also has a lot of pain in her low back that shoots down her right leg, through her knee, and into her big toe.  Tr. 38.  Johnson has pain in both legs but it is worse in her right leg.  Tr. 38.  Johnson also has pain that comes around her rib cage.  Tr. 35, 38, 39.  That pain makes it hard for her to drive.  Tr. 35, 38, 39.  Thus, while she has a driver's license, Johnson drives very rarely.  Tr. 35.  Johnson indicated she has a lot of pain and spends most of her day on her couch.  Tr. 38.  Johnson previously hurt her right knee but no longer has issues with her knee.  Tr. 45.

The pain in Johnson's rib cage started around January 2015.  Tr. 39.  The pain had improved some with an injection but the pain returned and Johnson had met with a surgeon the day prior to the hearing.  Tr. 39.  Johnson's doctors were planning on doing another injection and then possibly surgery.  Tr. 39.  Johnson described the pain in her ribs as a constant, stabbing

---

[8] At the close of the hearing, the ALJ noted for the record that she observed Johnson having to stand up and walk around at least 13 times during the hearing.  Tr. 64-65.

pain.  Tr. 39-40.  Johnson rates the constant pain a 5 on a scale of 1 to 10 with 10 being the worst and the stabbing pain a 7 or 8.  Tr. 40.  Johnson explained that the stabbing pain was not constant but it was very painful and occurred quite often especially if she tries to move.  Tr. 40.

Johnson started having pain in her low back as far back as February 2012.  Tr. 40, 42.  Johnson's low back problems started after a large wave knocked her son into her while they were in the ocean together.  Tr. 42.  She was still able to work but then one day when she was at home she stooped down to pick up a book and her back just went out.  Tr. 42-43.  Her low back pain was worse when it first started.  Tr. 40-41.  At first, she was unable to walk.  Tr. 40-41.  She had surgery in 2012 but she never got entirely better.  Tr. 41, 58.  Following her surgery, she tried physical therapy and tried physical therapy again a few times thereafter for her back problems.  Tr. 54-55.  Johnson did not feel that the physical therapy helped.  Tr. 55.  She also tried a stimulator but it caused her side pain so she was not able to use the stimulator.  Tr. 41.  Johnson tried injections as well.  Tr. 55.  Johnson completed a chronic pain rehabilitation program with the Cleveland Clinic.  Tr. 56.  She has been informed that any further surgery would be really complicated and painful.  Tr. 56.  Her low back pain has gotten progressively worse.  Tr. 41.  When she saw the surgeon the day before the hearing, she was informed that there really was not anything that could be done.  Tr. 41.

Johnson rated her low back pain a 5 or 6.  Tr. 41.  She indicated her back bothers her all the time and she is unable to do anything.  Tr. 41.  She tried to go to a waterpark with her children and grandchildren.  Tr. 41.  When they got there, all she could do was change between sitting and standing.  Tr. 42.  The pain got to be so bad, even with having taken a pain pill, that her children had to take her home.  Tr. 42.  Johnson can relieve some of the pain by lying down in a propped-up position on her side with pillows under and around her.  Tr. 43-44.

Johnson does not do household chores.  Tr. 41, 53.  She might go shopping at the store in town with her husband if they only need a couple of items.  Tr. 53.  For larger shopping, they have to travel about 40 minutes one-way so her husband usually does the larger shopping alone because it is a lot for Johnson.  Tr. 53.  It is painful for Johnson to stand and shower – she does it but it hurts.  Tr. 52.  She does not get in the bathtub because it hurts too much to sit in the bathtub.  Tr. 52.

Johnson estimated lying down more than 50% of her day.  Tr. 44.  To occupy herself during the day, Johnson sometimes goes on her back porch with her dog.  Tr. 53.  She has a lounge chair out back.  Tr. 53.  Her three children call her daily.  Tr. 53.  She plays some match-type games on her tablet and watches a lot of television.  Tr. 53-54.

Johnson can stand for only 10-15 minutes before she starts to get a lot of pain.  Tr. 44-45.  Also, she can sit for only 10-15 minutes.  Tr. 45.  Johnson could not estimate a specific distance or amount of time she could walk but noted that she could not walk very far.  Tr. 45.  Johnson estimated being able to lift and carry about 4 to 6 pounds.  Tr. 47.  Johnson can reach her arms overhead and reach them in front of her but if she reaches up to grab something and get it down off a shelf, for example, it hurts her ribs.  Tr. 54.  It is hard for Johnson to go up and down stairs.  Tr. 57.  Going down the stairs is harder for her.  Tr. 57.  Her bedroom and bathroom are on the first floor so she does not have to go upstairs in her home.  Tr. 57.  Johnson does not go into the basement.  Tr. 57.  Her husband does the laundry.  Tr. 57.

Johnson could not remember when she started having problems concentrating and remembering things but it had been going on for a while.  Tr. 45.  Johnson used to read all the time but now she does not read because she has to reread the same page over and over.  Tr. 45.  Johnson watches television but she watches the same program over and over because she cannot

27

really remember how it ends.  Tr. 46.  She used to take care of paying their bills but she was forgetting to pay them so her husband started taking care of the bills.  Tr. 46.  Johnson writes down when she takes her medication.  Tr. 46-47.  Johnson indicated she could probably follow a recipe but she does not cook anymore because it is difficult for her to stand at the counter and it hurts to sit and try to chop food.  Tr. 47.  When asked whether she got along with other people, Johnson stated she feels that people get frustrated with her because she repeats herself a lot but indicated that she does not fight with people.  Tr. 47.

Johnson has some problems with anxiety and depression for which her primary care physician prescribes an anti-depressant.  Tr. 47-48.  Johnson thinks her anti-depressants work but she was planning to see her physician to see if something should be changed because she was still a little depressed.  Tr. 48.  She was having a panic attack about once a month but they were not that bad.  Tr. 48-49.  Johnson gets short of breath and it causes her to hyperventilate.  Tr. 49.

Johnson takes a number of medications, including medicine for her stomach ulcer, nausea medicine, allergy medicine, pain medicine, nerve medicine and a muscle relaxer.  Tr. 50.  As far as side effects from her various medications, Johnson indicated she thinks they bother her stomach.  Tr. 50.  Johnson sleeps about 3 or 4 hours and then wakes up in pain.  Tr. 52.  She is up for a little while and then falls back asleep.  Tr. 52.  Johnson naps sometimes during the day but not a lot.  Tr. 52.

## 2. Vocational expert's testimony

Vocational Expert Joseph Thompson ("VE") testified at the hearing.  Tr. 58-64.  The VE described Johnson's past work, which included jobs as an optician, a light, skilled position and account clerk, a sedentary, skilled position.  Tr. 59.  The ALJ asked the VE to assume a hypothetical individual who is Johnson's age and has Johnson's education and work experience

who is able to perform light exertional work activity with the following limitations – can frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; should never climb ladders, ropes and scaffolds; can occasionally be exposed to unprotected heights and vibration; and should not be exposed to dangerous moving mechanical parts. Tr. 59-60. The VE indicated that the described individual would be able to perform Johnson's past work and there would be sedentary level jobs available, including account clerk, order clerk, and mortgage clerk. Tr. 60.

The ALJ then asked the VE to add the following limitations to the previous hypothetical – the individual can understand, remember, carry out simple, routine tasks; the environment should have low production standards; the individual can occasionally tolerate changes in a routine work setting, however, the changes should be well explained and introduced slowly; the individual can make simple work-related decisions; and the individual can frequently interact with supervisors, coworkers and the public. Tr. 60-61. The VE indicated that Johnson's past jobs would be eliminated due to the skill level. Tr. 61. There would be other jobs available, including folder, packer and mail clerk. Tr. 61. If the interaction with supervisors, coworkers and the public was changed to occasional interaction, the VE indicated that his answer would not change. Tr. 61. The VE also indicated that the jobs would remain if the individual was limited to superficial interaction with coworkers and the public, meaning the individual would have the ability to greet people; refer coworkers and the public to other coworkers regarding customers or coworkers' demands or requests; answer questions regarding the time of day; and give directions to the bathroom. Tr. 61. If the individual could never climb ramps or stairs, balance, stoop, crouch, crawl or kneel, there would be no jobs available. Tr. 61-62. The VE explained that the postural limitations, other than stooping, would not be an issue but the stooping limitation alone would eliminate all employment. Tr. 62.

The ALJ asked the VE to consider the first hypothetical but sedentary, not light, exertional work with the following additional limitations – the individual can understand, remember, and carry out simple routine tasks; the environment should have low production standards; the individual can occasionally tolerate changes in a routine work setting if the changes are explained and introduced slowly; the individual can make simple work-related decisions; and frequently interact with supervisors, coworkers, and the public. Tr. 62. The VE indicated that Johnson's past work would not be available to the described individual but there would be other work available, including order clerk, bench worker, and assembler. Tr. 62. If the individual could only occasionally interact with supervisors, coworkers or the public, the VE indicated that the order clerk position would be eliminated but an additional position that would be available was bonder. Tr. 62. If the interaction was changed to superficial interaction with coworkers and the public (as previously defined), the VE indicated that the last three jobs identified would remain. Tr. 62-63. If the individual could never climb ramps or stairs, balance, stoop, crouch, crawl or kneel, there would be no jobs available. Tr. 63. The VE explained again that the postural limitations, other than stooping, would not be an issue but the stooping limitation would eliminate all employment. Tr. 63.

The VE indicated that being off-task 20% of the time would eliminate all employment and consistently being absent one or two days per month would eliminate all employment. Tr. 63.

Johnson's counsel asked the VE whether there would be jobs available if a hypothetical worker could only stand and walk 2 hours and sit for two hours out of an 8-hour day. Tr. 63-64. The VE indicated that it would amount to part-time work so work would be eliminated. Tr. 64. Johnson's counsel next asked the VE to consider the ALJ's sedentary hypothetical which

included only superficial interaction and add that the individual could only occasionally reach and occasionally push and pull. Tr. 64. The VE explained that all sedentary, unskilled positions require frequent reaching, handling and fingering so occasional reaching would result in elimination of sedentary, unskilled positions. Tr. 64.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her March 17, 2017, decision, the ALJ made the following findings:[9]

1.      Johnson meets the insured status requirements of the Social Security Act through December 31, 2017. Tr. 13.

2.      Johnson has not engaged in substantial gainful activity since February 7, 2012, the alleged onset date. Tr. 13.

3.      Johnson has the following severe impairments: L3-4 herniation; chronic right lumbar radiculopathy; neuropathic leg pain; status-post laminectomy L3-4 with facetectomy and discectomy, and DCS placement; post laminectomy syndrome; myofascial pain syndrome; history of lumbar spondylosis; lumbar degenerative disc disease; lumbar and thoracic neuritis; spinal arthropathy; intercostal neuritis and neuralgia; arthritis; left sciatica; status-post thoracic laminectomy for removal of spinal cord stimulator; lumbosacral radiculitis; thoracic disc displacement with radiculopathy; history of right knee arthroscopy; and persistent depressive disorder with anxious distress.[10]  Tr. 13-14.

---

[9] The ALJ's findings are summarized.

[10] Various other impairments were found to be non-severe. Tr. 14. Johnson does not challenge the ALJ's finding of non-severe impairments.

4.      Johnson does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments. Tr. 14-16.

5.      Johnson has the RFC to perform a range of light work as defined in 20 C.F.R. § 404.1567.(b). More specifically, Johnson can lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; she should never climb ladders, ropes, and scaffolds; she can occasionally be exposed to unprotected heights and vibration; she should not be exposed to dangerous moving mechanical machines; she can understand, remember, and carry out simple, routine tasks; the environment should have low production standards; she can occasionally tolerate changes in a routine work setting; changes should be well explained and introduced slowly; she can make simple work related decisions; she can occasionally interact with supervisors; she can superficially interact with coworkers and the public, meaning she can greet people, refer the coworkers/public to other coworkers regarding coworkers/customers' demands or requests, answer questions about time of day, and give directions to the bathroom but superficial interaction would not involve Johnson dealing directly with demands or problems of coworkers/customers. Tr. 16-22.

6.      Johnson is unable to perform any past relevant work. Tr. 22-23.

7.      Johnson was born in 1964 and was 47 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 23. Johnson subsequently changed age category to closely approaching advanced age. Tr. 23.

8.      Johnson has at least a high school education and is able to communicate in English. Tr. 23.

9.      Transferability of job skills is not material to the determination of disability. Tr. 23.

10.     Considering Johnson's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Johnson can perform, including folder, packer and mail clerk. Tr. 23-24.

Based on the foregoing, the ALJ determined that Johnson had not been under a disability,

as defined in the Social Security Act, from February 7, 2012, through the date of the decision.

Tr. 24.

## V. Plaintiff's Argument

Johnson argues that the ALJ violated the treating physician rule when weighing opinions rendered by her treating physician Dr. Brown.

## VI. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989.   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's

decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      The ALJ did not err in weighing the opinions of treating physician Dr. Brown**

Johnson argues that the ALJ violated the treating physician rule when weighing opinions rendered by her treating physician Dr. Brown.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).  However, the "good reasons must be supported by the evidence

in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

The ALJ considered and explained the weight he assigned to Dr. Brown's opinions, stating:

> The claimant's physician, Vicki Brown, M.D., completed two *Medical Source Statement: Patient's Physical Capacity* forms dated July 7, 2015 and August 5, 2016. Dr. Brown opined the claimant could occasionally lift/carry 10 pounds and frequent[ly] lift/carry 5 pounds; sit for 2 hours in an 8-hour workday; rarely perform postural activities; occasionally reach, push/pull and frequently perform gross and fine manipulation; and was generally restricted from work with heights, temperature extremes, and moving machinery (Exhibits 13F and 20F). Partial weight is given to these assessments, as the evidence supports a range of light and not sedentary exertional work. Specifically, the claimant's imaging was consistent with mild degenerative changes (e.g., Exhibit 7F/17), she generally required conservative treatment, and exams showed mild/moderate lumbar tenderness and a normal gait (e.g. Exhibit 11F/4).

Tr. 19.

Johnson argues that the ALJ should have assigned great weight to Dr. Brown's physical capacity assessments, arguing that they were both consistent with and supported by the medical record and asserts that the ALJ's explanation for assigning partial weight is perfunctory and does not constitute "good reasons." The ALJ's explanation is not perfunctory. Following the ALJ's detailed discussion of the medical record evidence (Tr. 17-19), the ALJ provided her reasons for discounting Dr. Brown's more restrictive functional assessments (Tr. 19).

In stating her reasons for assigning partial weight to Dr. Brown's opinions, the ALJ provided examples of records supporting her reasons. Johnson contends that the ALJ relied on only a few records and that such limited reliance was insufficient. However, the ALJ did not rely on only the records cited as examples in the paragraph explaining the weight assigned to Dr.

Brown's opinions. As reflected in the ALJ's decision, the ALJ discussed multiple physical examination findings, noting that those findings were generally mild or normal. Tr. 19. Further, contrary to Johnson's suggestion, the ALJ did not ignore abnormal examination findings. *See* Tr. 18 (referencing Exhibit 1F/106 (Tr. 381), reflecting mildly limited knee range of motion and positive straight leg raise); Tr. 19 (noting that physical examinations showed mildly limited range of motion in the knee and lumbar and thoracic paraspinal muscle trigger points).

Contrary to Johnson's claim, the ALJ did not ignore the June 2016 MRI findings. *See* Tr. 18-19 (discussing the June 2016 MRI (Exhibit 19F/34, 38 (Tr. 1128, 1130)). Also, by concluding that Johnson generally required conservative treatment, the ALJ did not gloss over the fact that Johnson had three surgeries. As reflected in the decision, the ALJ discussed each of Johnson's surgeries. Tr. 18 (discussing 2012 discectomy and the spinal cord stimulator implantation and removal surgeries). Furthermore, the ALJ explained that she found that Johnson's treatment following surgeries was conservative and she had demonstrated improvement with treatment. Tr. 19. Johnson also argues that the ALJ minimized the extent of her treatment, which included extensive physical therapy, numerous injections and nerve blocks, and participation in an intensive chronic pain rehabilitation program. The ALJ did not ignore or minimize the foregoing evidence. *See* Tr. 18-19 (discussing at length Johnson's response to therapy, injections and nerve blocks and records relating to Johnson's treatment through the chronic pain rehabilitation program). Tr. 18-19. Rather, the ALJ weighed the evidence and found that the evidence did not support the more restrictive limitations contained in Dr. Brown's physical capacity assessments.

The Court's review is limited to whether the ALJ's decision is supported by substantial evidence. It is not the role of this Court to "try the case *de novo*, nor resolve conflicts in

evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  The ALJ clearly explained her reasons for assigning partial weight to Dr. Brown's opinions.  Johnson has not shown that the ALJ ignored evidence when weighing the evidence.  While Johnson disagrees with the ALJ's weighing of the evidence, she has not shown that the ALJ's decision is not supported by substantial evidence.  Nor has she shown that the ALJ's weighing of her treating physician's opinions violated the treating physician rule.

## VII. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

April 29, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge